UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

ANDREW STEPHEN HULETT,

        Debtor.

Case No. 19-46577-mlo
Hon. Maria L. Oxholm
Chapter 7

_____

MANAGEDWAY COMPANY,

        Plaintiff,

vs.

ANDREW STEPHEN HULETT,

        Defendant.

Adversary No. 19-04308-mlo

_____

EXHIBIT 3
Brief in Support of Plaintiff's Motion for Summary Judgment Pursuant to F. R. BANKR. P. 56

In re:

ANDREW STEPHEN HULETT,

     Debtor.

Case No. 19-46577-mlo
Hon. Maria L. Oxholm
Chapter 7

—————————————————

MANAGEDWAY COMPANY,

     Plaintiff,

vs.

ANDREW STEPHEN HULETT,

     Defendant.

Adversary No. 19-04308-mlo

—————————————————

## BRIEF IN SUPPORT OF PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT PURSUANT TO F. R. BANKR. P. 7056

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ........................................................................................................ 1

FACTS ........................................................................................................................ 2

    A.    ManagedWay and Hulett enter into an Employment Agreement ........................... 2

    B.    Hulett is terminated from his employment with ManagedWay ............................. 3

    C.    Hulett takes employment with UBX ..................................................................... 3

    D.    Hulett solicits ManagedWay's vendors and customers on behalf of UBX ............ 4

    E.    Hulett uses ManagedWay's trademark image to solicit business for UBX............ 6

    F.    Hulett solicits customers and vendors of ManagedWay on behalf of Cogent ................................................................................................................. 7

    G.    ManagedWay files suit against Hulett and UBX ................................................... 9

    H.    Hulett continues violating his restrictive covenants ............................................. 9

    I.    The State Court grants summary disposition to ManagedWay on all counts ....... 10

    J.    Hulett files chapter 7 bankruptcy ....................................................................... 10

MOTION STANDARD.................................................................................................. 10

ARGUMENT ................................................................................................................ 11

I.    THE DEBT OWED TO MANAGEDWAY BY HULETT IS NON-DISCHARGEABLE UNDER 11 U.S.C. § 523(a)(6)...................................................... 11

    A.    Hulett caused injury to ManagedWay by willfully and maliciously violating the restrictive covenants in his Employment Agreement ...................................... 12

    B.    Hulett willfully and maliciously injured ManagedWay by conspiring with UBX to tortiously interfere with ManagedWay's business and contractual relationships ...................................................................................................... 18

II.    THE STATE COURT OPINION ESTOPS HULETT FROM RE-LITIGATING WHETHER HIS CONDUCT WAS WILLFUL AND MALICIOUS OR THE AMOUNT OF DAMAGES SUSTAINED BY MANAGEDWAY ................................. 20

CONCLUSION AND RELIEF REQUESTED ........................................................................ 21

# TABLE OF AUTHORITIES

## CASES

*Admiral Ins. Co. v. Columbia Cas. Ins. Co.*,
194 Mich. App. 300, 486 N.W.2d 351 (1992)................................................. 18, 19

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)........................................ 10

*Berryman v. Rieger*,
150 F.3d 561 (6th Cir. 1998) ............................................................... 11

*Chudzinski v. Hanif (In re Hanif)*,
530 B.R. 655 (Bankr. E.D. Mich. 2015)...................................................... 13, 20

*Early Detection Center, P.C. v New York Life Ins. Co.*,
157 Mich. App. 618; 403 N.W.2d 830 (1986)................................................... 19

*Ewers v. Cottingham (In re Cottingham)*,
473 B.R. 703 (B.A.P. 6th Cir.2012) ......................................................... 11

*Feldman v. Green*,
138 Mich. App. 360, 360 N.W.2d 881 (1984).................................................. 18

*In re Caletri*,
517 B.R. 655 (Bankr. E.D. La. 2014) ........................................................ 14

*In re Cardin*,
2013 WL 1092118 (Bankr. E.D. Tenn. Jan. 31, 2013)........................................... 18

*In re Sarff*,
242 B.R. 620 (6th Cir. BAP 2000) ......................................................... 1, 12

*Mahrle v. Danke*,
216 Mich.App. 343; 549 N.W.2d 56 (1996).................................................... 18

*Morganroth & Morganroth, PLLC v. Stollman (In re Stollman)*,
404 B.R. 244 (Bankr. E.D. Mich. 2009)...................................................... 12

*Musilli v. Droomers (In re Musilli)*,
379 Fed. Appx. 494 (6th Cir. 2010)......................................................... 11

*National Sign and Signal v. Livingston*,
422 B.R. 645 (W.D. Mich. 2009) ........................................................... 19

*Patriot Fire Protection, Inc. v. Fuller (In re Fuller)*,
560 B.R. 881 (Bankr. N.D. Ga. 2016) ..................................................... 11, 13

*Phillips v. Weissert (In re Phillips)*,
    434 B.R. 475 (B.A.P. 6th Cir. 2010) ......................................................... 20

*Prairie Eye Center v. Butler (In re Butler)*,
    297 B.R. 741 (Bankr. C.D. Ill. 2003)........................................................ 14

*Synergeering Group, LLC v. Jonatzke (In re Jonatzke)*,
    478 B.R. 846 (Bankr. E.D. Mich. 2012) .................................................. 20

## **STATUTES**

11 U.S.C. § 523(a)(6)............................................................................... passim

## **RULES**

Fed. R. Bankr. P. 7056........................................................................... 10

Fed. R. Civ. P. 56................................................................................... 10

MCR 2.116(C)(10)................................................................................. 10

# INTRODUCTION

Defendant Andrew Hulett ("Hulett") is neither an "honest," nor an "unfortunate" debtor. *In re Sarff*, 242 B.R. 620, 629 (6th Cir. BAP 2000). Over more than a year, and even during the pendency of civil litigation, Hulett repeatedly and intentionally injured his former employer, Plaintiff ManagedWay Company ("ManagedWay"), by using ManagedWay's trade secret and proprietary information to solicit its vendors and current and protective customers, all in blatant violation of his restrictive covenants with ManagedWay.

> Q. But you agree, as we've discussed in this case and as I've evidenced in part today and through the deposition last week and multiple filings with the court, that you obviously have breached provisions contained in [your Employment Agreement] in connection with your affiliation with Cogent and/or UBX?
>
> A. Correct.

*See* Ex. A – Deposition Transcript Andrew Hulett at pp. 101:20-102:9.

Even after ManagedWay sued Hulett, he continued soliciting ManagedWay's customers and vendors. At the same time, Hulett attempted to obstruct ManagedWay from prosecuting its claims against him in the Oakland County Circuit Court resulting in imposition of monetary sanctions in the amount of $8,450.00. Eventually, Hulett was:

> (1) found liable for breaching the restrictive covenants contained in his Employment Agreement, for misappropriating ManagedWay's trade secrets, and for conspiring with his new employer to tortiously interfere with ManagedWay's contractual relationship and business expectancies; and
>
> (2) ordered to pay damages to ManagedWay in the amount of $2,714,000.00.

Hulett is estopped from litigating again his willful and malicious conduct which injured ManagedWay. Because there is no dispute that the debt owed by Hulett to ManagedWay is non-dischargeable under 11 U.S.C. § 523(a)(6), summary disposition is properly granted now in favor of ManagedWay.

## FACTS

**A.     ManagedWay and Hulett enter into an Employment Agreement.**

ManagedWay provides telecommunications, data center, networking and cloud computing services.  *See* Ex. B – Affidavit of Reese Serra at ¶ 4.  During his employment with ManagedWay, Hulett sold and marketed ManagedWay's products and services to existing and prospective customers of ManagedWay.  In his sales role, Hulett necessarily had access to much of ManagedWay's customer, vendor, and propriety information and trade secrets.  *Id*. at ¶ 9.

On around February 28, 2014, Hulett and ManagedWay entered into a written Employment Agreement (the "Employment Agreement").  *Id*. at ¶ 7; *see* Ex. C – Employment Agreement.  Under the Employment Agreement, Hulett promised, among other things, not to solicit ManagedWay's existing or prospective customers, vendors, or employees for a period of two years following the end of his employment with ManagedWay:

> 2.1    Covenants Regarding Competitive Protection.  The Employee hereby covenants and agrees not to engage or participate, directly or indirectly, in any of the following until the day following the expiration of two (2) years after the cessation of the Employee's employment with the Company:
>
> (a)    Solicitation of Clients.  [Hulett shall not] knowingly call upon or solicit any Person that was a Client at any time during Employee's employment with Company or that was solicited by Company or otherwise had any contact with Company during a twenty-four (24) month period preceding the termination of Employee's employment with Company.
>
> (c)    Solicitation of Vendors.  [Hulett shall not] solicit, wither directly, indirectly or through an Affiliate, any current vendor, supplier, or independent contractor of the Company for purposed of engaging Services or buying products, or encouraging such vendor, supplier, or independent contractor to cease or diminish providing products or services to the Company, or to adversely change the terms under which such current vendor, supplier or independent contractor provides such products or services.

*Id*. at Art. 2.1(a).  Hulett also promised not to ever divulge or use any of ManagedWay's proprietary business information and trade secrets:

> 2.2.  <u>Confidentiality; Disparagement</u>.   The Employee agrees that the Confidential Information is and will remain the property of the Company.  Unless otherwise agreed to in writing by the Company, the Employee shall treat as confidential and shall not make personal use of, disclose or otherwise make available any Confidential Information to any Person for any reason other then employees, attorneys and consultants of the Company who have authority and a need to know and who are under like-kind burden of confidentiality.

*Id*. at Art. 2.2. Finally, Hulett agreed that these restrictive covenants were "reasonable" and "do not impose any undue hardship." *Id*. at Art. 2.3.

### B.      Hulett is terminated from his employment with ManagedWay.

On July 12, 2017, ManagedWay terminated Hulett's employment.  *Id*. at ¶ 10.  During his exit interview, Hulett was provided and executed a "Termination of Employment Exit Interview Acknowledgment" in which he acknowledged his "obligations to protect the company trade secrets and proprietary and confidential information, the covenants against solicitation, and other obligations existing under my employment agreement with the company..."  *See* Ex. D – Acknowledgment at p. 1; Ex. A at p. 78:5-12 ("I recall reviewing a document in the meeting and I believe a document was sent to me afterward as well.").   However, Hulett began almost immediately violating his restrictive covenants.

### C.      Hulett takes employment with UBX.

 Shortly after he was terminated from ManagedWay, Hulett began working for UBX Cloud, Inc. ("UBX").  *Id*. at pp. 26:25—27:1.  Hulett's title at UBX was "Sales Director."  *Id*. at 34:11-15.  As UBX's Sales Director, Hulett was "responsible for all sales activities and managing related sales and marketing vendors and managing our sales team."  *Id*. at p. 34:17-22.

Hulett informed UBX of his restrictive covenants with ManagedWay.  *Id*. at pp. 81:21—82:1.  UBX claimed then that it "explicitly told Andrew not to have any contact with ManagedWay

clients." *See* Ex. E – UBX Deposition Transcript at p. 60:17-80. But, in fact, UBX encouraged Hulett to do just the opposite.

### D. Hulett solicits ManagedWay's vendors and customers on behalf of UBX.

In his capacity as Sales Director of UBX, Hulett repeatedly breached provisions in his Employment Agreement with ManagedWay—with UBX's participation and encouragement. For example, on October 11, 2017, Franz Salas of Pure Storage, Inc. sent correspondence to Hulett and UBX's President stating that he was "looking forward to working with [UBX] and building a pipeline together," and providing Hulett a "list of accounts that we can chase after together." *See* Ex. F – 10-11-17 Salas E-mail.

Hulett responded to Salas, by accepting his invitation to "chase accounts" and providing Salas with detailed information (obtained during his employment at ManagedWay) about several actual or prospective customers of ManagedWay, including Yottabyte, BDO Seidman, Mott Community College, and Macomb ISD. *Id*. Hulett knew that these companies were actual or prospective customers and vendors of ManagedWay. *See* Ex. A at pp. 116:15-19 (Mott), 120:7-12 (Yottabyte), 121:16-20 (Macomb ISD), 121:24-122:3, 123:11-22 (BDO), 125:20-25 (all); Ex. B ¶¶ 12-13. Nevertheless, in violation of his Employment Agreement, Hulett readily responded to Mr. Salas' request for customer lead information.

Yet another willful and malicious violation by Hulett occurred on around December 8, 2018. 123.net provides enterprise, data center, network, and voice services. 123.net is both an important customer of and vendor to ManagedWay. *See* Ex. B at ¶ 15. ManagedWay cultivated its business relationship with 123.net over the course of many years, and paid substantial dollars to 123.net to build a business partnership. *Id*. 123.net has a digital partner portal which its partners, including ManagedWay, access and submit information to 123.net through unique user names and

passwords.  *Id*. at ¶ 16.  ManagedWay accesses 123.net's digital partner portal with its assigned unique username and password.  *Id*.

Because UBX did not have an account with 123.net, Hulett—while working for UBX—stole ManagedWay's unique ID, username and password information to access 123.net's digital partner portal in order to submit to 123.net a quote request for a UBX's customer, St. Anne's Mead:

```
To:        Andrew Hulett[Andrew.Hulett@ubxcloud.com]
From:      RO2-5A2E9B8A@orders.123.net
Sent:      Mon 12/11/2017 9:53:53 AM
Importance:        Normal
Subject:   [123.net] QUOTE REQUEST ID: RO2-5A2E9B8A   Internet
Received:  Mon 12/11/2017 9:53:55 AM

    Order for: ManagedWay
    Requested by: kpatterson
    Request type: Internet
       ORDER ID: RO2-5A2E9B8A
       Term: 36 Months
    Received Date: 2017-12-11 09:53:53

Desired Due Date: 2017-12-11
    Expedite: No
----------------
Facility Type: Wireless
Qty: 1

A End Location (000-000-0000 )
Managed Way
16106 W Twelve Mile Rd
Southfield, MI 48307
```

*See* Ex. G – Quote Request.  UBX explained that Hulett should not be accessing 123.net's portal with ManagedWay's credentials.  *See* Ex. E at p. 104:1-9 ("to use old account to log into a portal, different creds not supplied that shouldn't be accessing basically.").  But Hulett continued to pursue a business relationship with 123.net, attending a sales meeting with 123.net in April, 2018. *See* Ex. A at p. 23:4-24:11.

Michigan Statewide Educational Network (MiSEN) is an important customer of ManagedWay.  *See* Ex. B at ¶ 11.  When Hulett was employed by ManagedWay, Hulett worked on preparing ManagedWay's bid to MiSEN – a bid which ManagedWay in fact won.  *Id*.  Hulett knew that MiSEN was a customer of ManagedWay:

> Q. And you knew that Michigan State Educational Network was a customer of
> ManagedWay at the time that you obtained the bid documents for Michigan
> State Educational Network on behalf of UBX?
>
> A. Correct.

*See* Ex. A at p. 46:18-22.

In direct violation of his contractual covenants contained in his Employment Agreement,

Hulett, while working for UBX, solicited business from MiSEN. On January 5, 2018, Hulett wrote

to UBX's President that:

> **I'm working on a bid to provide internet access to the Michigan State
> Education Network (MISEN). When I was at [ManagedWay], I won the
> FY2017 half of this bid and sold them a 60G DIA circuit and it's the same
> procurement team as before. … I think we [UBX Cloud] could have a really
> good shot at this one and do this a few ways.**

*See* Ex. H – 1-5-18 Hulett E-mail "MiSEN Internet Access Bid." UBX's President responded by

acknowledged that by soliciting MiSEN, UBX would be competing with ManagedWay. *Id*.

("We'd also put a CPE device at the end, just like MW does, and manage the circuit end to end.").

While employed with UBX, Hulett also solicited Teoma Systems – ManagedWay's

prospective customer. *See* Ex. I – Solicitation to Teoma. Hulett agreed that this solicitation

violated his Employment Agreement. *See* Ex. A at p. 137:8-23. Hulett also solicited Liberty

Center and Light Tower, both ManagedWay customers. *Id*. at p. 31:17-22.

### E. Hulett uses ManagedWay's trademark image to solicit business for UBX.

ManagedWay owns this trademark image:



*See* Ex. B at ¶¶ 19-20.  ManagedWay used and uses this trademark image in its own marketing materials, presentations, and on its website.  *Id*.; Ex. J – ManagedWay's "Finding the Goldilocks Zone"  materials;  *see  also,  e.g.*,  http://www.managedway.com/cloud-dedicated-server. ManagedWay did not ever authorize Hulett or UBX to utilize its trademark in any way.  *See* Ex. B at ¶ 20.

Hulett used ManagedWay's trademark image in UBX's marketing materials and business proposals. *See*, *e.g.*, Ex. K – Proposals. UBX admitted to using ManagedWay's trademark because UBX wanted customers to believe that UBX is "partners" with ManagedWay.  *See* Ex. E at p. 144:10-24.  Hulett acknowledged that his use of ManagedWay's trademark in UBX's marketing materials was improper.  *See* Ex. A at p. 146:1-6.  UBX conceded that ManagedWay was entitled to damages as a result of UBX's improper use of ManagedWay's trademark image.  *See* Ex. E at pp. 157:25-158:6.

**F.**    **Hulett solicits customers and vendors of ManagedWay on behalf of Cogent.**

Hulett's egregious conduct did not end with UBX.  In April, 2018, Hulett began working for Cogent Communications, a direct competitor of ManagedWay.  *See* Ex. A at 10:13. Hulett's title at Cogent was "Global Account Manager."  *Id*. at p. 10:8-17.  As Cogent's Global Account Manager, Hulett engaged in direct sales and account management.  *Id*. at p. 10:23.  Hulett continued violating his restrictive covenants with ManagedWay by soliciting ManagedWay's customers, including Solvaris, CloudSAFE, MojoHost and 123.net.  *Id*. at pp. 19:24-20:24, p. 21:10-11.

For example, on April 23, 2018, Hulett solicited ManagedWay's customer, Solvaris:

From: **Hulett, Andrew** <ahulett@cogentco.com>
Date: Mon, Apr 23, 2018 at 10:36 AM
Subject: Andrew - New Contact Info
To: "mlauer@solvaris.com" mlauer@solvaris.com

7

Hey Matt!

I hope this message finds you well. I just wanted to reach out and let you know that I just took a position at Cogent. I'd love to catch up when you have a few minutes!

Cheers!

Andrew
**Andrew Hulett** | Global Account Manager, Detroit
**Cogent Communications** | www.cogentco.com
mobile: 202-531-9331 | office: 248-602-0590 ext.5480 | email: ahulett@cogentco.com

*See* Ex. L – 4-23-18 Solvaris E-mail. Solvaris has been, and is, a customer of ManagedWay. *See* Ex. B at ¶ 17. Hulett serviced the Solvaris account on behalf of ManagedWay during his employment with ManagedWay. *Id.*; Ex. A at p. 20:20-24; 107:12-19.

Also on behalf of Cogent, Hulett solicited CloudSAFE:

From: **Hulett, Andrew** <ahulett@cogentco.com>
Sent: Mon, Apr 23, 2018 at 11:00 AM
To: mbutz@cloudsafe.com
Subject: Andrew - New Contact Info

Hey Michael,

I hope this message finds you well. Your ASN came across my desk and I thought I'd reach out and see if you guys have any IP transit or colocation needs this year. Do you have a few minutes to chat this week? I'll also be in Southfield next week if you'd prefer a face-to-face meeting!

Cheers!

Andrew
**Andrew Hulett** | Global Account Manager, Detroit
**Cogent Communications** | www.cogentco.com
mobile: 202-531-9331 | office: 248-602-0590 ext.5480 | email: ahulett@cogentco.com

*See* Ex. M – 4-23-18 CloudSAFE E-mail. CloudSAFE has been, and is, a customer of ManagedWay. *See* Ex. B at ¶ 18. Hulett serviced the CloudSAFE account on behalf of ManagedWay during his employment with Plaintiff. *See* Ex. A at pp. 133:11—134:8. CloudSAFE later terminated its business relationship with ManagedWay. *See* Ex. B at ¶ 18. Hulett acknowledged that his solicitation of CloudSAFE was a violation of the restrictive covenants in his Employment Agreement. *See* Ex. A at pp. 135:24—136:2.

**G.      ManagedWay files suit against Hulett and UBX.**

On April 23, 2018, ManagedWay sent correspondence to Hulett cautioning him from violating the restrictive covenants contained in his Employment Agreement. *See* Ex. N – Demand Letter. Hulett responded by falsely claiming that he had not solicited customers of ManagedWay. Thus, on April 26, 2018, ManagedWay filed suit against Hulett in the Oakland County, Michigan Circuit Court alleging claims for (1) breach of contract; (2) injunctive relief (the "State Court Case"). *See* Ex. O – Complaint. The State Court Case was assigned to Honorable James M. Alexander. ManagedWay later amended its Complaint to include UBX as a Defendant and pled claims for (1) breach of contract (as to Hulett), (2) tortious interference with contractual relationship (as to UBX), (3) tortious interference with business expectancy (as to UBX), (4) violation of the Michigan Uniform Trade Secrets Act (as to Hulett and UBX), (5) civil conspiracy (as to Hulett and UBX), and (6) injunctive relief. *See* Ex. P – Second Amended Complaint.

**H.      Hulett continues violating his restrictive covenants.**

In the State Court Case, Hulett continued in his recalcitrant behavior. That conduct was met by Judge Alexander with imposition monetary sanctions, totaling $8,450.00. *See* Ex. Q – 10-24-18 Order; Ex. R – 11-19-18 Order; Ex. S – 12-3-18 Order; Ex. T – 3-14-19 Order. Remarkably, Hulett also continued to violate his restrictive covenants.

For example, Hulett attempted to obtain business from 365 Data Centers. ManagedWay provides services to 365 Data Centers. In October, 2018, Hulett had arranged a reminder in his e-mail account to contact Bob DeSantis of 365 Data Centers in order "to replace ManagedWay."

- Data center redundancy provider (IP transit to replace Managedway)

*See* Ex. U – Reminder; Ex. V – Hulett Notes. Hulett's notes also reflect his continued efforts to solicit ManagedWay's customer, Yottabyte:

Yottabyte:
* brightline connection...He's a ManagedWay customer. VDI Opportunity ---Wants to resell.
* Action: Stop by office to discuss offering

*Id*.

## I.     The State Court grants summary disposition to ManagedWay on all counts.

On February 6, 2019, ManagedWay moved for summary disposition on all counts of its Second Amended Complaint pursuant to MCR 2.116(C)(10).  In response, Hulett admitted that he breached the Employment Agreement by soliciting ManagedWay's current and prospective customers.  *See* Ex. W – State Court Opinion at p. 3 ("it is clear that Defendant Hulett sent e-mails in violation of his non-solicitation agreement..."). On March 8, 2019, Judge Alexander issued an Opinion and Order (the "State Court Opinion"), granting ManagedWay's motion in its entirety and entering judgment for ManagedWay and against Hulett in the amount of $2,714,000.00.  *Id*.

## J.     Hulett files chapter 7 bankruptcy.

Hulett made no effort to satisfy the judgment against him.  Instead, on April 30, 2019, Hulett filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code.  ManagedWay timely filed this adversary proceeding seeking to have this Court determine that the debt owed by Hulett to ManagedWay is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

## MOTION STANDARD

Fed. R. Civ. P. 56 for summary judgment is incorporated into Fed. R. Bankr. P. 7056. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). "[T]he mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id*. at 247–48. A "genuine" issue is present "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir.1998) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505).

## ARGUMENT

## I. THE DEBT OWED TO MANAGEDWAY BY HULETT IS NON-DISCHARGEABLE UNDER 11 U.S.C. § 523(a)(6).

There is no genuine issue of material fact that the judgment entered against Hulett in the State Court Case is non-dischargeable. Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." A willful injury is one "where the debtor 'desires to cause consequences of his act, or ... believes that the consequences are substantially certain to result from it.'" *Ewers v. Cottingham (In re Cottingham)*, 473 B.R. 703, 709 (B.A.P. 6th Cir.2012) (quoting *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir.1999) (other citations omitted)). In other words, the injury itself must be deliberate or intentional, not just a deliberate or intentional act that leads to injury. *Musilli v. Droomers (In re Musilli)*, 379 Fed. Appx. 494, 498 (6th Cir. 2010) (unreported) (quoting *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974, 140 L.Ed.2d 90 (1998)). However, "[i]f there was a substantial certainty that the debtor's conduct would cause the injury, that will suffice." *Patriot Fire Protection, Inc. v. Fuller (In re Fuller)*, 560 B.R. 881, 889 (Bankr. N.D. Ga. 2016). "Malicious injury means an injury caused in 'conscious disregard of one's duties or without just cause or excuse.'" *Cottingham*, 473 B.R. at 709 (quoting *Wheeler v. Laudani*, 783 F.20 610, 615 (6th Cir. 1986)). With this framework in mind, there is no genuine issue of material fact that Hulett caused a willful and malicious injury to ManagedWay.

**A.      Hulett caused injury to ManagedWay by willfully and maliciously violating the restrictive covenants in his Employment Agreement.**

The Sixth Circuit Bankruptcy Appellate Panel has recognized that "damages for a breach of contract can be a non-dischargeable debt under § 523(a)(6)." *Sarff*, 242 B.R. at 626. In *Sarff*, the debtor's former employer sought a determination that the damages awarded to it and against the debtor under a state court judgment were non-dischargeable debts under § 523(a)(6). *Id*. at 623. The employer obtained a state court judgment based on the debtor's breach of a non-compete agreement, interference with business relationships, misappropriation of trade secrets and breach of the duty of loyalty. *Id*. at 625.  According to the state court:

> The evidence clearly and convincingly shows that both Sarff and [co-defendant] Snyder violated their covenants not to compete. Not only did they conspire to open a competing company while enjoying the benefits of their employment with [Spring Works], but they stole springs, boxes and customers from their employer to further their new enterprise.
>
> ***
>
> [Sarff] was a very active part of National, providing names of The Spring Works' customers to Brewer and making calls himself to new prospects. His explanation that he is nothing more than a creditor was found by the Magistrate to be completely without merit. His contempt for Mr. Weil [the owner of Spring Works] was readily apparent.

*Id*. at 625-626. The court determined that in light of these factual findings that the debt owed by Sarff to his former employer was non-dischargeable under section 523(a)(6).

Likewise, in *Morganroth & Morganroth, PLLC v. Stollman (In re Stollman)*, 404 B.R. 244, 266 (Bankr. E.D. Mich. 2009), a debt arising from the debtor's breach of a contract was found to be non-dischargeable under section 523(a)(6).  There, Judge Shefferly concluded that the debtor's actions "evidence a willful and deliberate breach of a contract accompanied by aggravating circumstances," and that the debtor "clearly intended to injure [the creditor-plaintiffs], by appropriating proceeds that she believed to be subject to liens held by all of the Plaintiffs, including

Virchow. At a minimum, the Debtor knew that the consequences of her actions were substantially certain to harm all of the Plaintiffs." *Id*. at 266-267.

In *Chudzinski v. Hanif (In re Hanif)*, 530 B.R. 655 (Bankr. E.D. Mich. 2015), the plaintiff alleged in a state court complaint that shortly after she agreed to enter into business with the debtor, he engaged in a deliberate pattern of conduct to cut her out of the business and keep all profits for himself. *Id*. at 660. Judge McIvor found that the debt owed by the debtor was non-dischargeable under section 523(a)(6) because:

> Defendant's actions in excluding Plaintiff from HHCC and depriving her of any and all opportunity to participate in and develop HHCC, were deliberate and on-going over a period of time. That pattern of conduct could lead to only one result—Plaintiff's exclusion from the business. That result was entirely foreseeable and substantially certain to occur.

*Id*. at 670.

In *In re Fuller*, the bankruptcy court held that a debt arising from a state court judgment against the debtor for violating non-compete agreement with former employer was non-dischargeable as a debt for willful and malicious injury:

> First, the Debtor's conduct was malicious—there was no just cause for him to breach the Agreement, and to do so was wrongful. Second, the Debtor acted with the substantial certainty that his conduct would cause injury to Patriot. The Debtor had worked in the fire-protection industry for nearly ten years before the events at issue here, and therefore would have understood how precious each client is to a business engaged in that industry, and how poaching clients necessarily caused harm to Patriot in that the client would no longer need Patriot's services.

> Additionally, the Debtor received a cease and desist letter from Patriot before the lawsuit was filed, emphasizing that from that point he was on even greater notice that his actions were likely to harm Patriot. Thus, the Debtor's actions were done with substantial certainty that they would harm Patriot by reducing Patriot's client pool.

> Faced with all of these indicia that his actions were causing Patriot harm, the Debtor, nevertheless, persisted in violating the agreement. There is no other plausible inference than that the Debtor had a substantial certainty that his conduct would cause injury, and yet he acted anyway. As this conduct was willful and

malicious, the resultant debt, represented by the judgment of the Superior Court, is excepted from discharge pursuant to § 523(a)(6).

560 B.R. at 889.

In *Prairie Eye Center v. Butler (In re Butler)*, 297 B.R. 741 (Bankr. C.D. Ill. 2003), the debtor violated restrictive covenants contained in his employment agreement by soliciting patients of his former employer. The bankruptcy court found that the debtor knew that his actions were substantially certain to harm his ex-employer's business, irrespective that he claimed he was not motivated by desire to injure his ex-employer, but only to earn livelihood for his families and to provide care to patients:

> Debtor may dispute that he subjectively intended to injure Plaintiff by intentionally violating the covenant not to compete, thereby breaching the Employment Contract. However, Debtor does not (and could not) seriously dispute the fact that he had subjective knowledge that injury to Plaintiff was substantially certain to result from his intentional acts. He clearly knew that violating the covenant not to compete would cause financial harm to Plaintiff, yet he knowingly violated the covenant anyway. As indicated above and as established by precedent, that is all that is required to meet the standard of nondischargeability set forth in *Geiger*. *See In re Markowitz*, *supra*; *In re Cox*, *supra*; *In re Budig*, *supra*; *In re Kidd*, *supra*. *See also In re Long*, 774 F.2d 875, 881 (8th Cir.1985) (conduct which is targeted at a creditor at least in the sense that the conduct is certain or almost certain to cause financial harm is "malicious" as required by 11 U.S.C. § 523(a)(6)).
>
> Debtor evidently (and mistakenly) deems his professed altruism toward his patients and toward his families as a satisfactory legal defense. Irrespective of his motivation for intentionally and repeatedly breaching the Employment Agreement, Debtor was fully cognizant of and intended the harm he caused Plaintiff, and he had no just cause or excuse—despite his protestations to the contrary—for causing injury to Plaintiff. Accordingly, it is clear from the record and from the Debtor's admissions that the subject debt arose from a willful and malicious injury and that the debt is, therefore, nondischargeable under 11 U.S.C. § 523(a)(6).

*Id.* at 749.

In *Weatherall Radiation Oncology v. Caletri (In re Caletri)*, 517 B.R. 655, 663–64 (Bankr. E.D. La. 2014), the bankruptcy court found that a debt arising from the debtor's breach of contract and violation of his non-competition agreement was excepted from discharge:

An injury to an entity or property may be a willful and malicious injury if it was wrongful, even in the absence of personal hatred, spite, or ill-will. Dr. Caletri, who admitted his acts were intentional, understood his contractual obligations to WRO and knowingly retained professional fees for his own benefit with the intent of depriving his employer of revenue. This caused a severe financial injury to WRO, the amount of which was fixed by the state court judgment. Thus, Dr. Caletri's actions surrounding his breach of contract were substantially certain to cause injury to WRO and the debt is nondischargeable under Section 523(a)(6).

Hulett's actions in this case, like the debtor*s* in each of the cases cited above, evidence an ongoing pattern of willful and deliberate breaches of a contract accompanied by aggravating circumstances. To begin with, Hulett knew he was bound by restrictive covenants. ManagedWay reminded Hulett of his obligations on his last day of employment (*see* Ex. D), and Hulett later told his new employer that he was bound by restrictive covenants (Ex. A at pp. 81:21—82:1; Ex. E at p. 60:17-80 ("explicitly told Andrew not to have any contact with ManagedWay clients.")).

Hulett admitted to knowing ManagedWay's current and prospective customers:

Q.     But certainly you had in your head a general awareness of substantial prospective customers when you were with ManagedWay; correct?

A.     Correct.

Q.     And you carried that knowledge that you had with you and accessed it when you went to UBX and Cogent; correct?

A.     Define access.

Q.     Recalled.

A.     Sure.

Q.     And that information included not only some conception of ManagedWay's actual and prospective customers and vendors but also other information important to ManagedWay such as pricing related information; correct?

A.     Correct.

*See* Ex. A at p. 158:1-16.

Hulett readily admits he solicited ManagedWay's customers and vendors:

> Q.     In paragraph 33 ManagedWay alleges, "Hulett has breached the terms of his employment agreement; for example, by soliciting customers and vendors of ManagedWay." You've already admitted during your deposition here today to those facts; correct?
>
> A.     Correct.

*See* Ex. A at p. 154:19-25; Ex. V at p. 3 ("Hulett admits to breaching said contract.").

Hulett admits he used ManagedWay's trademark in UBX's marketing materials and that doing so was improper.  *See* Ex. A at p. 146:1-6, p. 147:8-10.

Most damning, Hulett testified that after receiving a cease and desist letter from ManagedWay on April 23, 2018, he supposedly "modified" his behavior to stop working with ManagedWay customers and vendors.  *Id*. at p. 25:8-22.  However, in October, 2018—just a few weeks prior to his deposition and many months after ManagedWay filed the State Court Case—Hulett was *still* soliciting vendors and customers of ManagedWay:

Yottabyte:
- brightline connection...He's a ManagedWay customer. VDI Opportunity ---Wants to resell.
- Action: Stop by office to discuss offering

*See* Exs. U and V.

Hulett's breaches were so flagrant that his new employer, UBX, concluded that Hulett might be terminated from UBX:

> A.     Possible termination.
>
> Q.     For what?
>
> A.     For breach of contract.
>
> Q.     What contract?
>
> A.     His agreement with ManagedWay.
>
> Q.     How did he breach it?
>
> A.     He breached it by soliciting.

Q.      Soliciting who?

A.      Vendors.

Q.      And?

A.      Clients.

Q.      Of?

A.      ManagedWay.

*Id*. at p. 100:7-19.  Judge Alexander determined that ManagedWay was damaged as a result of Hulett's conduct in the amount of $2,714,000.00.  *See* Ex. W at p. 11.

In sum, (1) Hulett understood his contractual obligations to ManagedWay; (2) Hulett admitted his solicitation of ManagedWay's customers and vendors and use of ManagedWay's trademark was intentional and improper; and (3) Hulett's unlawful conduct continued even after ManagedWay filed suit against him for that conduct in the State Court Case.

Because Hulett was seeking to poach ManagedWay's customers and vendors and using its proprietary information to compete with ManagedWay, Hulett knew there was a substantial certainty that his conduct would cause injury to ManagedWay. Indeed, Hulett's conduct caused a severe financial injury to ManagedWay ($2,714,000.00), the amount of which was fixed by the State Court Opinion.  *See* Ex. W. Thus, there is no genuine issue of material fact that Hulett's actions surrounding his breach of contract were substantially certain to cause injury to ManagedWay.  Therefore, the debt owed by Hulett to ManagedWay is non-dischargeable under section 523(a)(6).

**B.    Hulett willfully and maliciously injured ManagedWay by conspiring with UBX to tortiously interfere with ManagedWay's business and contractual relationships.**

The State Court's judgment against Hulett is also non-dischargeable because Hulett was found to have unlawfully conspired with UBX to tortiously interfere with ManagedWay's business and contractual relationships. "Intentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'" *In re Cardin*, 2013 WL 1092118, at *5 (Bankr. E.D. Tenn. Jan. 31, 2013) (quoting Restatement (Second) of Torts § 8A cmt. a (1964)).

In Michigan, the elements of a claim for tortious interference with a contractual or business relationship are "(1) a contract, (2) a breach, and (3) an unjustified instigation of the breach by the defendant." *Mahrle v. Danke*, 216 Mich.App. 343, 350; 549 N.W.2d 56, 60 (1996) (citing *Jim–Bob, Inc. v. Mehling*, 178 Mich.App. 71, 95–96; 443 N.W.2d 451 (1989)). "[O]ne who alleges tortious interference with a contractual or business relationship must allege the **intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law** for the purpose of invading the contractual rights or business relationship of another." *Feldman v. Green*, 138 Mich. App. 360, 378, 360 N.W.2d 881 (1984). (emphasis added). "To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." *Id*. at 699.

"A civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a **criminal or unlawful purpose**, or to accomplish a lawful purpose by **criminal or unlawful means**." *Admiral Ins. Co. v. Columbia Cas. Ins. Co.*, 194 Mich. App. 300, 313, 486 N.W.2d 351 (1992). (emphasis added). "A claim for civil conspiracy may not exist in the air;

rather, it is necessary to prove a separate, actionable tort." *Early Detection Center, P.C. v New York Life Ins. Co.*, 157 Mich. App. 618, 632; 403 N.W.2d 830 (1986).

In *National Sign and Signal v. Livingston*, 422 B.R. 645, 657 (W.D. Mich. 2009) the district court considered whether Michigan state law claims for tortious interference with contract and tortious interference with business relationships established the elements for non-dischargeability under section 523(a)(6). The court concluded that they did:

> Livingston, a vice president of NSS, left NSS and induced several of the companies doing business with NSS to end their relationships with his former employer. At trial, a jury awarded NSS $1,800,000.00 in damages for the injuries suffered as the result of Livingston's conduct… [T]he debt Livingston owes NSS does fall under § 523(a)(6) of the nondischargeability provisions of the bankruptcy code.

*Id*. at 658–59.

Here, the State Court concluded that UBX was liable for tortious interference with ManagedWay's business and contractual relationships. *See* Ex. W at p. 6. In so finding, the State Court necessarily determined that UBX acted with malice and without justification in the law. *Id*. ("Defendants fail to present any evidence to support their argument that its actions were justified."). The State Court also found that Hulett conspired with UBX to interfere with ManagedWay's business and contractual relationships. *Id*. at p. 11. Thus, Hulett was found to have acted in concert with UBX to "accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Admiral Ins.*, 194 Mich. App. at 313. As the *Livingston* court found, the elements of ManagedWay's claims for civil conspiracy and tortious interference establish the elements for non-dischargeability under section 523(a)(6). The debt owed by Hulett is non-dischargeable.

## II. THE STATE COURT OPINION ESTOPS HULETT FROM RE-LITIGATING WHETHER HIS CONDUCT WAS WILLFUL AND MALICIOUS OR THE AMOUNT OF DAMAGES SUSTAINED BY MANAGEDWAY.

Hulett may not re-litigate the claims and issues adjudicated in the State Court. "The doctrine of collateral estoppel, also known as issue preclusion, prohibits litigation of issues that have been adjudicated in a prior action. The purpose of collateral estoppel is to protect parties from multiple lawsuits, to prevent the possibility of inconsistent decisions, and to conserve judicial resources." *Hanif*, 530 B.R. at 664.

"Principles of collateral estoppel apply to determinations of non-dischargeability of debt in bankruptcy cases." *Synergeering Group, LLC v. Jonatzke (In re Jonatzke)*, 478 B.R. 846, 855 (Bankr. E.D. Mich. 2012) (citing *Spilman v. Harley*, 656 F.2d 224, 227 (6th Cir. 1981)). "Because the State Court Opinion was issued by a state court in Michigan, this Court must look to Michigan law to determine what preclusive effect Michigan courts would give to the State Court Opinion." *Id*. (citing *Rally Hill Productions, Inc. v. Bursack (In re Bursack)*, 65 F.3d 51, 53 (6th Cir. 1995), citing *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81, 104 S. Ct. 892, 79 L.Ed.2d 56 (1984)).

Under Michigan law, collateral estoppel applies when "(1) there is identity of parties across the proceedings; (2) there was a valid, final judgment in the first proceedings; (3) the same issue was actually litigated and necessarily determined in the first proceeding; and (4) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding." *Phillips v. Weissert (In re Phillips)*, 434 B.R. 475, 485 (B.A.P. 6th Cir. 2010).

Each element of collateral estoppel is satisfied in this case: (1) ManagedWay and Hulett were both parties to the State Court Case, (2) the State Court granted summary disposition to ManagedWay and entered a final judgment against Hulett in the amount of $2,714,000.00, and

(3) Hulett participated in the State Court Case until its conclusion. As demonstrated above, the State Court found that Hulett acted willfully and maliciously in repeatedly and knowingly (1) violating the restrictive covenants contained in his employment agreement, (2) misappropriating ManagedWay's trade secrets, and (3) conspiring with his new employer to tortiously interfere with ManagedWay's business relationships. *See* Ex. W at p. 3 ("Hulett admits to breaching said contract"); p. 6 ("UBX cloud admits that Plaintiff's clients were solicited"); p. 8 (Hulett contacted several potential clients on behalf of UBX Cloud and prepared bids in order to secure business on behalf of UBX Cloud"); p. 8 ("UBX Cloud was aware, through Hulett, of [ManagedWay's] current and potential business relationships"); p. 4 ("Defendants fail to present any evidence that their actions were justifiable"); p. 10 ("Defendants admit to misappropriating [ManagedWay's trademark without consent"); p. 10 (noting that Defendants do not present any evidence contradicting ManagedWay's allegations of civil conspiracy). Because there is no genuine issue of material fact that Hulett's willful and malicious conduct was adjudicated in the State Court Opinion, summary judgment is properly granted in favor of ManagedWay.

## CONCLUSION AND RELIEF REQUESTED

For all of the foregoing reasons, ManagedWay respectfully requests that this Court grant summary judgment in its favor and find that the debt owed by Hulett to ManagedWay in the amount of $2,714,000.00 is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

Respectfully submitted,
HOWARD & HOWARD ATTORNEYS PLLC

Dated: September 12, 2019

By: */s/ Brandon J. Wilson*
    Brandon J. Wilson (P73042)
    450 West Fourth Street
    Royal Oak, MI 48067
    Telephone: (248) 645-1483
    E-mail: bjw@h2law.com
    *Attorneys for ManagedWay Company*